UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT

LUDYS NINO,
    Plaintiff,                                          CIVIL ACTION No.
                                                                    14-CV-1130 (JCH)
v.

OLIVER DOENGES and                           SEPTEMBER 29, 2017
ANDRES SANCHEZ,
    Defendants.

## BENCH TRIAL RULING

### I. INTRODUCTION

This is an action brought by plaintiff Ludys Nino ("Nino") pursuant to sections 1983 and 1988 of title 42 of the United States Code against defendants Oliver Doenges and Andres Sanchez, both officers in the Greenwich, Connecticut, Police Department. Nino alleges that Officers Doenges and Sanchez entered her home without a warrant and conducted a search, without consent and in the absence of exigent circumstances, in violation of the Fourth Amendment to the United States Constitution.

The case was tried to the court on September 25, 2017.

### II. FINDINGS OF FACT

On August 15, 2012, Ludys Nino called the Greenwich Police Department and requested to speak with the chief of police about the FBI planting probes in her house and watching her. Nino was told that someone would call her back. Captain Pamela Gustovich was told of Nino's call. Captain Gustovich called Nino twice. Both times, someone picked up. Captain Gustovich could hear breathing on the line, but no one spoke. Captain Gustovich performed a records check on Nino and discovered that this

1

was not Nino's first contact with the Greenwich Police. In the months preceding August 15, Nino had voiced a range of complaints to the police, including a complaint in April that someone had put poison in her juice; complaints in May and July that someone was putting radiation in her house that was making her feel sick; and another complaint in July that her roommate had inserted a microchip in her body.

Captain Gustovich dispatched Greenwich Police Officers Oliver Doenges and Andres Sanchez to Nino's address at 25 Alexander Street, Greenwich, Connecticut, to check on Nino's welfare.[1] The dispatcher who called Officer Sanchez told him to contact the desk officer, Sergeant Reeves, for background on the visit to Nino. Sergeant Reeves told Officer Sanchez that Nino had called the police, described Nino's response to Captain Gustovich's calls, and explained that Captain Gustovich wanted Officer Sanchez to check on Nino's wellbeing.

Officer Sanchez had met Nino twice before. The first time, she had come to the police station to file a report about her phones being tapped and the FBI's unresponsiveness when she had contacted them. She had also complained of an unjustified foreclosure on her house. The second time, a little over a month before the visit at issue in this case, Officer Sanchez went to Nino's residence with another officer in response to a call Nino had placed to the police department. At that time, Nino complained that someone was shooting radiation into her home and referred to a microchip in her body.

---

[1] The defendants were acting pursuant to a Greenwich Police policy to assist persons unable to care for themselves "due to medical conditions or reduced mental capacity." Exh. 3. See also Conn. Gen. Stat. § 17a-503(a) (2010) (authorizing police officers to take persons with psychiatric disabilities who are dangerous to themselves or others and in need of immediate care and treatment into custody or commit to a hospital for emergency evaluation).

2

Upon arriving at Nino's address, Officer Sanchez waited for Officer Doenges to arrive and then knocked on Nino's door. When Nino opened the door, the defendants, who were wearing police uniforms, identified themselves as police officers. Officer Sanchez asked if they could come in and speak to her. Nino said yes and invited the officers in. She walked down the hallway and the defendants followed her, eventually arriving in the kitchen area. When they reached the kitchen, Officer Sanchez told Nino that Captain Gustovich had been trying to reach her and that the defendants had come on a welfare check. Nino became insulted because she understood Officer Sanchez to be saying that she was on welfare. Officer Sanchez clarified that he meant that he and Officer Doenges had come on a welfare check to make sure Nino was okay, not that she was on welfare payments, and asked if there was any way he could help her.

Nino told the defendants that people were shooting radiation through the house during the night and that her phones were tapped. She also said she was being physically assaulted at night. She said she did not go to the hospital because people following her could hack the systems and see her information. Officer Sanchez observed tin foil wrapped around the chandelier around her bed, which Nino had explained during Officer Sanchez's visit the previous month was to prevent radiation from reaching her. Officer Sanchez asked Nino if she would like him to call medics for her, but she declined. While they were in Nino's home, the defendants observed the condition of rooms visible from the hallway as they walked to and from the kitchen, and the state of the kitchen. Noting the absence of any visible food in the kitchen, Officer Doenges opened the refrigerator to see if Nino had basic provisions, which he observed she did. The defendants concluded that Nino was not a threat to herself based on the

orderliness of her home and the food in the refrigerator. They provided her with service cards and left the residence. After departing, the defendants documented their visit and attempted to contact Nino's son and social services.

Both the defendants and Nino spoke calmly throughout the interaction, beginning at the front door and while in Nino's house. The only exception was Nino's aggravation when she thought she had been mistaken as being on welfare. At no time did the defendants raise their voices or intimidate Nino. Nino did not ask the defendants to leave at any point or to stop what they were doing. The visit lasted for approximately 20 minutes.

## III. CONCLUSIONS OF LAW

Section 1983 of Title 42 is a mechanism to seek damages for the deprivation of constitutional rights by state actors. See 42 U.S.C. § 1983. To prove a claim under section 1983, the conduct complained of "must have been committed by a person acting under color of state law" and "must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010).

There is no dispute that defendants were acting under color of state law as members of the Greenwich, Connecticut Police Department. Thus, the inquiry centers on whether Nino's rights were violated. See id.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A search conducted without a warrant is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." See Katz v. United States, 389 U.S. 347, 357 (1967) (footnote

omitted).  A search conducted pursuant to consent is one of those exceptions.  See Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973).  In order to "ascertain whether consent is valid, courts examine the totality of the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority."  U.S. v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995) (internal quotation marks and citations omitted).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  Id. at 423 (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991).  "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search."  Garcia, 56 F.3d at 4243(internal quotation marks and citation omitted).

Taking all the circumstances into consideration, there clearly was a reasonable basis to believe that Nino voluntarily gave the defendants her consent to enter her home.  There is nothing to indicate that Nino's consent was involuntary.  There is no evidence that the defendants threatened Nino or used force to gain her consent.  In response to Officer Sanchez's request to enter, Nino expressly affirmed that the defendants could come inside.  Even if, as Nino argues but the court does not find, she had not spoken expressly in response to Officer Sanchez's request, her conduct would constitute implied consent.  See U.S. v. Grant, 375 Fed. Appx. 79, 80 (2d Cir. 2010) (finding that defendant gave police his implied consent to enter his apartment by admitting the officers into the building and turning toward his apartment).

Nino argues that the defendants exceeded any consent they may have had when Officer Doenges opened the refrigerator. Officers Doenges and Sanchez argue that Nino's express consent at the door, along with her lack of objection to the defendants looking around and conversing with her in the apartment after being told they were there on a welfare check, constituted implied consent to a search incident to a welfare check, which included ensuring that Nino's health was not at risk from lack of food. The kitchen appeared bare to Officer Doenges, raising a concern—given Nino's emotional instability and apparent delusions—that she did not have food to eat. Officer Doenges argues that checking the refrigerator was critical to confirming that Nino had basic necessities, which would indicate that she was able to care for herself.

The court agrees. Given Nino's consent to enter and absent any objection following Officer Sanchez's explanation of why they were there, it was reasonable for the defendants to believe that they had Nino's consent to look around apartment, as related to a welfare check, including in her refrigerator. See Jimeno, 500 U.S. at 251.

Even if there was not implied consent to open the refrigerator, the court finds the defendants are entitled to qualified immunity on the search of the refrigerator. In analyzing government officials' claims to qualified immunity, courts assess whether the facts (1) "make out a violation of a constitutional right" and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Pearson, 555 U.S. at 232 (2009) (internal quotation marks omitted). "Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Winfield v. Trottier, 710 F.3d 49, 53 (2d Cir. 2013) (internal quotation marks

6

and citation omitted). Courts "may exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The court will turn to the second prong of the qualified immunity analysis because, while the issue of implied consent is unexplored in the context of welfare checks, the defendants did not violate a clearly established right when they opened Nino's refrigerator. See Dean v. Blumenthal, 577 F.3d 60, 68 (2d Cir. 2009) (proceeding to the second prong of the qualified immunity analysis when the resolution of the second prong was far clearer than that of the first and the case did not present an "appropriate opportunity to explore the complexities of a difficult constitutional question.") In determining the level of generality at which to define the right at issue in the second prong of a qualified immunity analysis, courts balance "the interests in vindication of citizens' constitutional rights and in public officials' effective performance in their duties." Trottier, 710 F.3d at 56 (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). "Rights are only clearly established if a court can 'identify a case where an officer acting under similar circumstances' was held to have acted unconstitutionally." Grice v. McVeigh, et al., No. 15-CV-4124 at 5 (2d Cir. Sept. 29, 2017) (quoting White v. Pauly, 137 S. Ct. 548, 552 (2017)).

In the instant case, the right being asserted is the right of the subject of a welfare check to be free from a search of closed objects in her home—in particular, in her refrigerator—after she has expressed her consent to officers to enter her home for a welfare check. Here, a reasonable police officer would have had—as the defendants

did—a reasonable ground to conclude Nino's welfare was at risk and checking whether there was food in the refrigerator was a reasonable step to take under all the circumstances. Whether or not there was a violation of the Fourth Amendment, the right at issue was not clearly established at the time Officer Doenges opened Nino's refrigerator. Cf. Batt v. Buccilli, 2017 WL 1190487 at *8 (W.D.N.Y. Mar. 31, 2017) (finding no controlling case that clearly establishes the answer to the question: "when performing a welfare check on an individual in response to a request from adult protective services (or a similar agency), may a police officer enter a location to determine the welfare of that individual?"). Courts have not ruled on the scope of consent in the context of welfare checks. Instead the question of the scope of consent has only arisen with respect to consent to search generally, see Jimeno, 500 U.S., at 251 (holding that it was "reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car"), or whether there were exigent circumstances, see Montanez v. Sharoh, 444 Fed. Appx. 484, 487 (2d Cir. 2011) (holding that a warrantless entry and search during an attempted "child welfare check" was justified by exigent circumstances where guns and drugs were a risk to children in the home). While an argument that Nino impliedly consented to the opening of her fridge goes beyond courts' understanding of implied consent to enter, see U.S. v. Grant, 375 Fed. Appx. 79, 80 (2d Cir. 2010) (finding that defendant gave police his implied consent to enter his apartment by admitting the officers into the building and turning toward his apartment), implied consent has not been addressed with regard to searching beyond plain view upon entry to a home in order to conduct a welfare check.

Given that the nature and extent of a consent to search in the context of a welfare check is not clearly established under preexisting law, the court finds that both defendants are entitled to qualified immunity: Officer Doenges, for opening Nino's refrigerator, and Officer Sanchez, for failing to intervene, assuming (which the record does not support) that he had the opportunity to prevent the action.

## IV. CONCLUSION

For the foregoing reasons, the court finds that Nino has failed to sustain her burden of proof regarding her section 1983 claim and orders judgment to enter for defendants Sanchez and Doenges.

**SO ORDERED.**

Dated at New Haven, Connecticut this 29th day of September, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge